IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

WILLIAM JOE ROBINSON, JR.,
       Petitioner,

vs.                                 Case No.:  3:12cv283/MCR/EMT

MICHAEL D. CREWS,
       Respondent.
_____/

## REPORT AND RECOMMENDATION

      Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 1).  Respondent filed a motion to dismiss the petition as untimely, with relevant portions of the state court record (doc. 20).  Petitioner filed a response in opposition to the motion (doc. 26).

      The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).  After careful consideration, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter.  It is further the opinion of the undersigned that the pleadings and attachments before the court show that the petition should be dismissed as untimely.

I.       BACKGROUND AND PROCEDURAL HISTORY

      The relevant procedural history of this case is established by the state court record (doc. 20).[1] Following a jury trial in the Circuit Court in and for Escambia County, Florida, Case No. 2005-CF-5093, Petitioner was found guilty of manslaughter with a weapon or firearm (Exs. A, B).  On April 27, 2006, he was adjudicated guilty and sentenced to 130 months of imprisonment followed by a

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's motion to dismiss (doc. 20).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

period of 10 years of probation, with pre-sentence jail credit of 235 days (Ex. C at 103–25, Ex. J at 349–54).

Petitioner appealed the judgment and sentence to the Florida First District Court of Appeal ("First DCA"), Case No. 1D06-2748 (Ex. D). The First DCA affirmed the judgment on February 28, 2008 (Ex. G). Robinson v. State, 975 So. 2d 587 (Fla. 1st DCA 2008). Petitioner did not seek further review.

On July 7, 2008, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (see doc. 1 at 3; doc. 20, Ex. I at 1–41). The state circuit court summarily denied the motion on February 27, 2009 (Ex. J at 343–47). Petitioner appealed the decision to the First DCA, Case No. 1D09-1224 (Ex. J at 379). The appellate court affirmed per curiam without written opinion on May 28, 2009, with the mandate issuing July 28, 2009 (Exs. K, N). Robinson v. State, 12 So. 3d 756 (Fla. 1st DCA 2009) (Table).

On September 2, 2009, Petitioner filed another Rule 3.850 motion (Ex. O at 1–16). The state circuit court summarily denied the motion on October 5, 2009 (id. at 17–19). Petitioner appealed the decision to the First DCA, Case No. 1D09-6049 (id. at 56). The appellate court affirmed per curiam without written opinion on March 25, 2010, with the mandate issuing April 20, 2010 (Exs. P, Q). Robinson v. State, 32 So. 3d 626 (Fla. 1st DCA 2010) (Table).

On March 7, 2011, Petitioner filed, through counsel, another Rule 3.850 motion (Ex. R at 1–11). The state circuit court summarily denied the motion on October 18, 2011 (id. at 38–43). Petitioner appealed the decision to the First DCA, Case No. 1D11-6575 (id. at 96). The appellate court affirmed per curiam without written opinion on April 10, 2012, with the mandate issuing May 8, 2012 (Exs. S, T). Robinson v. State, 85 So. 3d 490 (Fla. 1st DCA 2012) (Table).

Petitioner filed his federal habeas petition on June 11, 2012 (doc. 1 at 1). He asserts the following grounds for relief:

A. Ground One:

> Newly discovered evidence due to a Brady violation in which prosecution failed to disclose evidence material to guilt and/or innocence.

B. Ground Two:

> Actual innocence claim that created a miscarriage of justice.

### C.  Ground Three:

Trial court committed fundamental error when failing to instruct the jury on the provision of section 776.013, Florida Statutes (2005), which unconstitutionally altered the way in which the jury determines the issue of self-defense and should be applied retroactively.

### D.  Ground Four:

Whether trial counsel was ineffective on the face of the record for failing to request jury instructions which would have informed the jury of the presumptions created by Ch. 2005-27, Laws of Florida.

### E.  Ground Five:

Whether trial court erred in denying Petitioner's motion for judgment of acquittal and/or motion for directed verdict which was made at the close of the State's case.

### F.  Ground Six:

Trial counsel's cumulative errors caused prejudice to the Defendant by denying him of due process rights to a fair trial.  Thus, violating his Sixth and Fourteenth Amendment [sic] guaranteed by the U.S. Constitution.

(doc. 1 at 5–27).

## II.    ANALYSIS

Pursuant to the requirements set forth in 28 U.S.C. § 2244, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L.No. 104-132, 110 Stat. 1214, which became effective on April 24, 1996, a one-year period of limitation applies to the filing of a habeas petition by a person in custody pursuant to a state court judgment.  The limitation period runs from the latest of:

(A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Section 2244(d)(1). Respondent contends the appropriate statutory trigger for the limitations period is § 2244(d)(1)(A), the date Petitioner's conviction became final, which Respondent contends is May 28, 2008 (doc. 20 at 4–5).

Petitioner does not expressly argue that a different statutory trigger for the federal limitations period applies;[2] however, several of his claims are based upon evidence discovered after trial, specifically, the post-trial statements of Joel Houtz, a trial witness, that he (Houtz) planned, observed, and/or participated in the victim's attempt to rob Petitioner immediately prior to Petitioner's shooting the victim. Liberally construing Petitioner's arguments, in light of his pro se status, the undersigned will consider whether the appropriate trigger for the limitations period is the date on which the factual predicate of his claims could have been discovered through the exercise of due diligence.

Petitioner contends he has obtained "newly discovered evidence" that would have impeached the trial testimony of Joel Houtz and supported Petitioner's defense of self-defense. At Petitioner's trial, on February 20 and 21, 2006, Joel Houtz testified that in the early morning hours of September 15, 2005, he was in the area of the Gateway Inn motel (Ex. A at 98–99). He testified that Mike, the victim in this case, went to a convenience store and returned with beer (*id.* at 99). He testified that it was daylight when Mike returned (*id.*). Houtz testified he saw a blue GMC Envoy SUV in the parking lot of the motel, but he never saw anyone driving the vehicle or in the vehicle (*id.* at 99–100). Houtz testified:

> We [he and Mike] were further from the SUV drinking beer. Mike brought the beer back, we were drinking beer and then I would say five minutes later, about a good 30 yards away further from the parking lot I turned around and I seen [sic] the door of the SUV open, right and Mike was like leaning in it and then I turned back the other way, like to turn my back the other way, I mean just kind of second glanced at it and then I heard a gunshot and I turned around and I seen [sic] Mike fall on the ground. . . . .

---

[2] In response to the motion to dismiss, Petitioner argues he is entitled to review of his claims through the "fundamental miscarriage of justice," or "actual innocence," exception to the time bar (doc. 26)

> I looked at the gunshot—I seen [sic] him, I looked at the, at Mike laying [sic] down like he was gunshot [sic] and I went around the building and I seen the SUV pull back and it just was parked there so, and it took off and then I went around and went to the owner of the motel room and we came back and called 911.

(Ex. A at 100). Houtz testified he did not see how the door of the SUV was opened; he just saw that it was already opened and Mike was leaning in (*id.* at 100–01, 110). He testified after he saw Mike shot, he did not see the door of the SUV shut, but he saw the SUV back out and drive away (*id.* at 101). Houtz testified that after the police arrived, he himself was arrested on an outstanding warrant in an unrelated case and was transported to the jail (*id.* at 102). He testified that while he was in a holding cell at the jail, he saw a black man and heard the man say, "Nobody is going to fuck with [me]" (*id.* at 103–04). Houtz identified Petitioner in court as the man he saw at the jail (*id.* at 103).

On cross-examination, Houtz testified that earlier in the evening, a group of people, including him, were standing around the SUV, but he never saw anybody inside the vehicle (Ex. A at 107). He also testified that Mike was smoking cocaine prior to going to the store that night (*id.* at 108–09). He testified he never heard a verbal exchange between Mike and the person inside the SUV (*id.* at 110–11). He testified approximately 30 seconds elapsed between the time he saw Mike at the SUV and the time he heard the gunshot (*id.* at 111). He testified he never saw who was inside the SUV (*id.* at 112). Houtz testified Mike brought prostitutes to the motel, and Mike's aunt Teresa was one of the prostitutes who worked for Mike (*id.* at 114). Houtz testified he provided a statement to police on September 15, 2005, the night of the shooting, as well as on October 11, 2005 (*id.* at 103).

At trial, Petitioner testified that at approximately 2:30 a.m. on September 15, 2005, he called his friend Jared Anderson and asked if Anderson knew any prostitutes he could have sex with that night (Ex. B at 190–91). He testified he and Anderson met at a gas station, and Petitioner followed him to the Gateway Inn (*id.* at 191). He testified after they arrived at the motel, he and Anderson walked up to the motel, and a white male was standing near the building (*id.* at 192). He testified Anderson talked to the white male, and then Anderson introduced him to Teresa (*id.*). He testified ten minutes later, he and Teresa left the motel and drove to his parents' house (*id.* at 193). He testified he parked in the driveway, and she gave him oral sex for approximately 15 minutes (*id.*). Petitioner testified they then drove to a store and bought a box of condoms and a Sprite (*id.* at 193–94). He testified that on the way to the store, he showed Teresa a gun, explained to her why he carried it, and

placed it under the driver's seat in front of him (*id.* at 195–96).  Petitioner testified they then drove to a park and had sex (*id.* at 194).  He testified he drove back to the Gateway Inn and paid Teresa a total of $80 (*id.* at 195).  He testified he asked her if he could sleep for five to ten minutes, because he was feeling drowsy, and she responded it was okay (*id.* at 196).  He testified he parked in a parking spot and tried to sleep, but he felt sick and threw up twice outside his driver's door (*id.* at 199–200).  He testified he then fell asleep at approximately 4:30–5:00 a.m., while it was still dark (*id.* at 200).  Petitioner testified he was awakened in the "morning" by the sound of someone opening and closing his passenger side door, and he heard a male say, "He left his door unlocked." (*id.*).  He testified he sat up in his seat, placed his gun in his lap, and started his vehicle (*id.* at 201).  He testified:

> Once I put the truck in reverse I started rolling back a couple of feet and then my door on the driver's side was immediately snatched open and a white male reached in the vehicle and tried to put his arm around me and was grabbing me around my upper body trying to motion to pull me out of the vehicle.

(*id.* at 201).  Petitioner testified he had not met the male before, and he did not see the man before the man yanked open the car door (*id.* at 201–02).  Petitioner testified at the time the man opened the door, "I felt that he was, with him grabbing me the way that he was and the way that he opened the car door, I felt that he was going, had the intent to cause me physical harm and was robbing me." (*id.* at 202).  Petitioner testified the man grabbed him around his chest and was trying to grip him around his neck to pull him out of the vehicle (*id.* at 202–03).  He testified he (Petitioner) was using his left hand to push the man off at the same time the man was trying to come into the vehicle and trying to grip his shirt to pull him out of the vehicle (*id.*).  Petitioner testified he was fearful and repeatedly told the man to get off him (*id.*).  He testified he was not able to completely push the man off him, but he prevented the man from leaning further into the vehicle (*id.*).  Petitioner testified he felt in fear of his life (*id.* at 204).  He testified he grabbed his gun with his right hand, put it to the man's temple, and pulled the trigger, at the same time he was using his left hand to keep the man from coming closer into the vehicle (*id.* at 204–05, 213).  Petitioner testified the man's body dropped and fell outside the vehicle, and at the same time, Petitioner lost his balance and caught himself with his left foot on the ground to keep from falling out of the vehicle on top of the man (*id.* at 204).  He testified when he put his foot on the ground, he looked to his left and saw another white male (*id.* at 206).  Petitioner testified he got back in his vehicle, closed the door, and left the scene (*id.*).  He testified he went to Ethan Anderson's

house (Jared Anderson's brother) and wiped blood off himself and his vehicle (*id.* at 190, 208). He testified he then went to his parents' house, and detectives arrived and arrested him (*id.* at 208–09). Petitioner testified when he arrived at the jail, a man named Joel (Houtz) was there with the victim's girlfriend (*id.* at 210, 216). Petitioner testified he stated to Joel, "Everything I worked for I'm not going to let somebody just take it away because I was in fear for my life, that's the reason that I reacted the way I did." (*id.*).

On cross-examination, Petitioner testified his vehicle was stopped at the time he shot the victim (Ex. B at 211). Petitioner testified that when he first spoke with officers, he did not tell them the victim had tried to rob him or that he was in fear for his life (*id.*).

In Petitioner's instant habeas petition, he contends that after his trial he obtained "newly discovered evidence" that Joel Houtz knew about, witnessed, and participated in the attempted robbery of Petitioner, and saw the victim attempt to choke Petitioner twice before Petitioner shot the victim (doc. 1 at 5–12). Petitioner asserts he obtained this evidence from his mother, Linda Robinson, and his friend Jared Anderson (the friend who Petitioner called to find a prostitute on the night of the shooting). Petitioner asserted in his third Rule 3.850 motion that he learned of Jared Anderson's information in April of 2010, and he learned of his mother's information at or near that time as well (Ex. R at 32–34). Petitioner submitted affidavits from his mother and Jared Anderson in state court, and both of those affidavits are part of the state court record (*id.* at 8–11).

Jared Anderson's affidavit, executed August 27, 2010, states that on the night of the shooting, Petitioner came to his house and described the shooting (Ex. R at 8–9). Anderson states while he was serving a sentence at the Escambia County Jail after Petitioner's trial, Joel Houtz was housed in his cell (*id.*). Anderson states Houtz told him that prior to the shooting, the victim's aunt had told the victim and Houtz that Petitioner had a lot of money on his person (*id.*). Anderson states Houtz told him that he and the victim decided that Petitioner, who was asleep in his SUV, was an easy target (*id.*). Anderson states Houtz told him "it was a strong-arm robbery all the way." (*id.*). Anderson further states:

> 7.     Houtz told me that when he went to the passenger side, he saw the decedent try to choke William Robinson, and saw Robinson produce a firearm, whereupon Houtz started to run.

8.      Houtz said that he saw the decedent try to choke William Robinson a second time, and that is when the gunfire began.  Houtz stated that not only was he a witness to the attempted robbery of William Robinson, he participated in the attempted robbery.

(*id.*).

Linda Robinson's affidavit, executed June 17, 2010, states that in mid-June of 2008 (more than two years after Petitioner's trial), she went to the Gateway Inn to find any witnesses who may have knowledge of the events surrounding the shooting (Ex. R at 10–11).  She states she made contact with Joel Houtz, and Houtz told her he knew who she was (*id.*).  Ms. Robinson states she asked Houtz why he robbed Petitioner, and Houtz responded, "Yeah, I robbed your punk-ass son." (*id.*).  Houtz then moved toward her and said, "F[_]k you, bitch," and hit her left hand with his closed fist (*id.*).  Ms. Robinson states she called law enforcement, who responded to the scene, but they refused to arrest Houtz (*id.*).

The question under § 2244(d)(1)(D) is not when the petitioner first <u>discovers</u> the new evidence, but when he <u>could have discovered</u> the evidence through the exercise of due diligence.  *See* 28 U.S.C. § 2244(d)(1)(D); <u>Brown v. Barrow</u>, 512 F.3d 1304, 1307 (11th Cir. 2008).  Therefore, the only relevant question is whether Petitioner could have discovered that Joel Houtz knew about, witnessed, and/or participated in the attempted robbery of Petitioner at a date earlier than May 29, 2008, the date his conviction became final.[3]

Petitioner is "presumed to have conducted a reasonable investigation of all facts surrounding [his] prosecution." <u>In re Boshears</u>, 110 F.3d 1538, 1540 (11th Cir. 1997) (citing <u>McCleskey v. Zant</u>, 499 U.S. 467, 498, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991)).  Due diligence "does not require a prisoner to undertake repeated exercises in futility or to exhaust every imaginable option, but rather to make reasonable efforts." <u>Aron v. United States</u>, 291 F.3d 708, 712 (11th Cir. 2002).  Here, the "newly discovered evidence" consists of statements made by Joel Houtz, who Petitioner and defense counsel knew was a witness to the shooting.  Diligence would require Petitioner to ascertain whether

---

[3] The First DCA affirmed Petitioner's judgment and sentence on February 28, 2008.  Petitioner did not seek review of the judgment in the United States Supreme Court; therefore, his conviction became final upon expiration of the ninety-day period for doing so, May 29, 2008.  *See* <u>Chavers v. Sec'y, Fla Dep't of Corr.</u>, 468 F.3d 1273, 1274–75 (11th Cir. 2006) (judgment of conviction becomes "final" after the expiration of the ninety-day period in which the petitioner could have filed a petition for a writ of certiorari, which begins to run on the date of the appellate court's affirmance of the conviction, not the date of the appellate court's mandate).

defense counsel was investigating whether Houtz was involved in the planning and execution of alleged attempted robbery, including whether Houtz saw the victim choke Petitioner.  Petitioner testified at trial that immediately prior to the victim's reaching in the driver's side door and grabbing him, he heard his passenger door open and close and a male say, "He left his door unlocked." Petitioner further testified that after he shot the victim, he looked to his left and saw another white male.  He also testified that when he arrived at the jail, a man named Joel was there with the victim's girlfriend.  Therefore, prior to trial, Petitioner was aware that a second man may have been involved in the attempt to rob him, and that Houtz was at the scene of the shooting.

Additionally, defense counsel was aware that Joel Houtz was a witness to the shooting and that officers obtained two pre-trial statements from him, one on the day of the shooting and the other approximately one month later.  Houtz testified at trial and was cross-examined by defense counsel, who used Houtz's statements to law enforcement during his cross-examination.  Defense counsel had an opportunity and a duty to exercise due diligence to reveal alleged untruths during Houtz's cross-examination.  Defense counsel could easily have inquired of Houtz whether he had discussed robbing Petitioner with the victim, and whether he was positioned at Petitioner's passenger door when the victim attempted to rob Petitioner and saw the victim attempt to choke Petitioner.  No such questions were asked.[4]  Further, it does not appear defense counsel even deposed Houtz, as evidenced by Houtz's responding "No, sir," when counsel asked Houtz during cross-examination whether Houtz had ever met or spoke with him (counsel) before (*see* Ex. A at 105).  Indeed, Petitioner asserts in his § 2254 petition that if defense counsel had interviewed Houtz prior to trial, counsel would have learned that Houtz participated with the victim in attempting to rob Petitioner (doc. 1 at 25–27).[5]

---

[4] Defense counsel asked Houtz where he was standing in relation to the SUV <u>when the victim returned from the store with the beer</u> (*see* Ex. A at 109), and Houtz responded he was "about 20, 30 yards in the street area" behind the SUV (*id.*).  Counsel asked, "And you said it was about five minutes later that you saw [the victim] at the SUV, the blue SUV?" (*id.* at 110).  Houtz responded yes, and testified he saw the victim leaning inside the SUV (*id.*).  Counsel did not ask Houtz whether, during that 5-minute period, he changed his location to the passenger side of the SUV; nor did counsel ask Houtz if he saw the victim choking Petitioner.

[5] Petitioner argued, through postconviction counsel, in his third state postconviction motion that it was unlikely Petitioner's trial counsel could have discovered the fact that Houtz planned to rob Petitioner and was standing at the passenger side of the vehicle when the victim attempted to choke Petitioner, because Houtz made pre-trial statements essentially consistent with his trial testimony that he was 30 yards away when he saw the victim leaning into Petitioner's vehicle, and he never saw anyone inside Petitioner's vehicle (Ex. R at 34–35).  Petitioner argued Houtz was motivated to stick to this story, because his truthful admissions would have exposed him to prosecution as a

Based upon the foregoing, the undersigned concludes that diligence by Petitioner and defense counsel at or before trial could have led to the discovery of evidence that Houtz planned, participated in, and/or observed the alleged attempted robbery of Petitioner by the victim.[6] Therefore, to the extent Petitioner argues the statutory trigger for the federal limitations period is 28 U.S.C. § 2244(d)(1)(D), his argument is unpersuasive.[7]

Even if the court accepted Petitioner's argument that § 2244(d)(1)(D) is the appropriate statutory trigger, his petition would still be untimely. The record shows that within two months from the date his conviction became final, Petitioner could have discovered, with reasonably diligent efforts, the fact that Houtz participated in the alleged attempted robbery. Jared Anderson's affidavit states he became aware of Houtz's statements while he (Anderson) was serving an 11-month, 15-day sentence in the Escambia County Jail after Petitioner's trial (which occurred in February of 2006) (Ex. R at 8). Anderson's affidavit omits the dates he served that sentence (*id.*). However, the court takes judicial notice of information available on the database maintained by the Escambia County Florida

---

participant in the attempted robbery (*id.*). However, defense counsel's failure to make <u>any</u> effort to inquire of Houtz into these matters, either prior to trial or at trial, shows a lack of reasonable diligence.

[6] When Petitioner presented his claim of "newly discovered evidence" to the state court in his third Rule 3.850 motion, the state court determined that the existence of a second assailant was not truly a newly discovered fact:

> Defendant would have known before trial whether a second man had been involved in the robbery, and trial counsel could have discovered evidence tending to show that fact by exercise of due diligence before the commencement of trial. According to Defendant's own testimony at trial, there were other witnesses to the incident.[FN 4]
>
>> [FN 4: reference to trial transcript, Ex. B at 198–99, 200–206).

(Ex. R at 40).

[7] Petitioner also alleges in his § 2254 petition that the prosecutor knew about Joel Houtz's "undisclosed statements" prior to trial and failed to disclose them to the defense (*see* doc. 1 at 5–7, 10–12). He additionally alleges the prosecutor provided Houtz immunity in exchange for his trial testimony (*id.* at 6). However, Petitioner has provided no factual support for either allegation. According to Petitioner, Houtz made the alleged "undisclosed statements" to Jared Anderson and Petitioner's mother <u>after</u> trial, and he alleges no facts suggesting Houtz made similar statements prior to trial. Further, in Petitioner's postconviction pleadings he stated, through counsel, that he was <u>not</u> suggesting that the State had actual knowledge that Houtz testified incompletely or falsely (Ex. R at 13 n.1, Ex. R at 25 n.1); indeed, Petitioner never asserted a <u>Brady</u> violation in his postconviction pleadings (*id.*).

Case No.: 3:12cv283/MCR/EMT

Clerk of the Circuit Court, viewed July 9, 2013, http://www.escambiaclerk.com,[8] According to the docket entries in Jared Anderson's criminal cases, between 2006 and 2010, he was sentenced to a term of 11 months and 15 days in two cases, Case Nos. 2006-CF-3397 and 2007-CF-5622. In Case No. 2006-CF-3397, Anderson was sentenced on March 16, 2007, to imprisonment in the county jail for 11 months and 15 days, with credit for 248 days, which means his sentence would have expired approximately June 21, 2007 (*see* attached docket sheet in Case No. 2006-CF-3397). In Case No. 2007-CF-5622, Anderson was sentenced on January 8, 2008, to imprisonment in the county jail for 11 months and 15 days on Count 2 in that case, but that sentence ran concurrently with the sentence on Count 1 in that case, which was 18 months in state prison, with credit for 90 days (*see* attached docket sheet in Case No. 2007-CF-5622). Information available on the public website of the Florida Department of Corrections ("FDOC"), viewed July 9, 2013, confirms that Jared Anderson was received into FDOC custody on January 16, 2008, and released from FDOC custody on January 18, 2009. *See* http://www.dc.state.fl.us/.

According to the docket sheets of Joel Houtz's criminal cases, viewed July 9, 2013, he was not in the Escambia County Jail between January 8–16 of 2008, when Jared Anderson was serving his sentence in Case No. 2007-CF-5622. Houtz was, however, in the county jail from March 29, 2007 to April 27, 2007, when Anderson was serving his sentence in Case No. 2006-CF-3397. At that time, Houtz was serving a 29-day sentence in Case Nos. 2006-MM-28316 and 2006-MM-28640 (*see* attached docket sheet in Case Nos. 2006-MM-28316 and 2006-MM-28640). This one-month period, from March 29, 2007 to April 27, 2007, is the only time Anderson was serving an 11-month and 15-day sentence in the county jail at the same time Houtz was in the county jail; therefore, this is the time period during which Houtz must have disclosed the "newly discovered evidence" to Anderson.[9] Both

---

[8] *See* Fed. R. Evid. 201; United States v. Berrojo, 628 F.3d 368, 369 (5th Cir. 1980) ("The doctrine of judicial notice permits a judge to consider a generally accepted or readily verified fact as proved without requiring evidence to establish it."); *see also* Mangiafico. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (district court permissibly looked to docket sheets in ruling on motion to dismiss because "docket sheets are public records of which the court could take judicial notice"); In re Salem, 465 F.3d 767, 771 (7th Cir. 2006) (taking judicial notice of state court dockets and opinions); Dawson v. Mahoney, 451 F.3d 550, 551 (9th Cir. 2006) (taking judicial notice of state court orders and proceedings); United States v. Mercado, 412 F.3d 243, 247–48 (1st Cir. 2005) (taking judicial notice of state court docket entries).

[9] Anderson did serve an 11-month, 30-day county jail sentence during the relevant time period. In Case No. 2005-CF-5314, he was sentenced on February 28, 2006, to imprisonment in the county jail for 11 months and 30 days,

Anderson and Petitioner refer to themselves as "friends" (*see* Ex. B at 190–91, Ex. R at 8). Therefore, it is likely Anderson would have communicated this information to Petitioner upon learning it, and it is unlikely Anderson would have waited three years to do so.

Moreover, even if Petitioner could not have discovered Jared Anderson's information regarding Houtz prior to April of 2010, when Petitioner states he learned of it, he could have discovered the fact of Houtz's participation earlier than that from his own mother, Linda Robinson. According to Linda Robinson's affidavit, in mid-June of 2008, she decided to attempt to locate Joel Houtz, who she described in her affidavit as a bald-headed, heavily tattooed man, who was a witness for the State during Petitioner's trial (Ex. R at 10). Ms. Robinson states at that time, she "had reason to believe" Houtz had participated in the attempted robbery of Petitioner, so she traveled to the Gateway Inn and spoke with Houtz, who admitted he participated in the alleged attempted robbery (*id.* at 10–11). Petitioner alleges no reason he could not have learned this information from his mother soon after she obtained it. Indeed, in analyzing the timeliness of Petitioner's claim of "newly discovered evidence" in state court, the state court determined:

> . . . the allegation regarding Defendant's mother's testimony is untimely filed. According to Ms. Robinson's affidavit, she learned the information regarding Houtz's false or incomplete testimony in "mid-June 2008." Defendant alleges no reason that he could not have learned this information from his mother within two years of June 2008 by exercise of due diligence. The Court finds that as Defendant's mother was interested enough in her son's conviction to subject herself to being "assaulted and battered" to assist him, she certainly would have divulged to her son at her earliest opportunity the facts that she had learned. The Court also finds it instructive that Defendant does not allege that he was unaware of this information before his attorney "disclosed the full information to the Defendant." Therefore, because Defendant waited three years after these facts were discoverable by exercise of due diligence, Defendant's claim with regard to his mother's testimony is untimely and procedurally barred.

(Ex. R at 40).

---

with credit for 155 days, which means his sentenced expired approximately September 21, 2006 (*see* attached docket sheet in Case No. 2005-CF-5314). During that time, Joel Houtz spent one day in the county jail. He was arrested September 9, 2006, in Case No. 2006-MM-27035, but he bonded out the same day (*see* attached docket sheet in Case No. 2006-MM-27035). It is thus evident that the conversation at issue here must have occurred during Anderson and Houtz's subsequent, overlapping incarceration at the county jail in early 2007. In any event, use of the later time frame is advantageous to Petitioner with respect to the timeliness analysis.

The undersigned agrees with the state court's reasoning that if Petitioner's mother was interested enough in her son's conviction to continue investigating it two years after his trial, she would not have withheld the "new" information from him and instead would have disclosed the results of her investigation to him at the earliest opportunity. Therefore, the undersigned concludes even if Petitioner could not have discovered Houtz's knowledge of or participation in the attempted robbery prior to the date his conviction became final (May 29, 2008), he certainly could have discovered it, with due diligence, by July 31, 2008, within one month of his mother's learning of it. Petitioner's remaining utterly passive, waiting for the "new" information to make its way to him, falls short of the type of "reasonable efforts" needed to demonstrate due diligence.

Therefore, establishing the appropriate trigger for the federal limitations period as July 31, 2008, pursuant to § 2244(d)(1)(D), Petitioner had one year from that date, or until July 31, 2009, to file his § 2254 petition. *See* <u>Downs v. McNeil</u>, 520 F.3d 1311, 1318 (11th Cir. 2008) (limitations period should be calculated according to "anniversary method," under which limitations period expires on anniversary of date it began to run) (citing <u>Ferreira v. Sec'y, Dep't of Corr.</u>, 494 F.3d 186, 1289 n.1 (11th Cir. 2007)). Petitioner did not file his federal petition on or before that date; therefore, it is untimely unless tolling principles apply and render it timely.

Section 2244(d)(2) provides:

> The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(2). As evidenced by the procedural history set forth *supra*, Petitioner filed a tolling motion on July 7, 2008, which was pending until July 28, 2009, the date of the First DCA's mandate affirming the lower court's denial of the motion. *See* <u>Nyland v. Moore</u>, 216 F.3d 1264, 1267 (11th Cir. 2000) (where Florida petitioner appeals trial court's denial of postconviction application, application remains pending until issuance of the mandate by the appellate court). Therefore, the federal limitations period began to run on July 29, 2009, and ran for **35 days** until September 2, 2009, when Petitioner filed his second motion for postconviction relief.[10] That motion was pending until April 20, 2010, upon issuance of the First DCA's mandate. *See* <u>Nyland</u>, *supra*. The limitations

---

[10] Pursuant to Rule 6 of the Federal Rules of Civil Procedure, the day of the event that triggers the time period is excluded from the calculation, and the last day of the period is included.

period then ran for **320 days** until March 7, 2011, when Petitioner filed his third postconviction motion. That motion was pending until May 8, 2012, when the First DCA issued its mandate. The federal limitations period expired **10 days** later, on May 19, 2012 (**35 days** + **320 days** + **10 days** = **365 days**). Petitioner's federal habeas petition, filed June 11, 2012, was thus filed 23 days too late.

Petitioner claims his actual innocence should serve as a gateway to consideration of his federal habeas claims (*see* doc. 26). The Supreme Court recently held that actual innocence, if proved, serves as a gateway through which a federal habeas petitioner may obtain review of his claims even when the AEDPA's one-year statute of limitations has expired. McQuiggin v. Perkins, — U.S. —, 133 S. Ct. 1924, 1928 (2013). Under the "actual innocence" exception, a petitioner is required to (1) present new reliable evidence that was not presented at trial, and (2) show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt in light of the new evidence. *Id.* at 1935 (citing Schlup v. Delo, 513 U.S. 298, 324, 327, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)). With respect to the term "reasonable juror," the Supreme Court instructed: "It must be presumed that a reasonable juror would consider fairly all of the evidence presented. It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." Schlup, 513 U.S. at 329. "The Schlup standard is demanding. The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" McQuiggin, 133 S. Ct. at 1936 (citing Schlup, 513 U.S. at 316). Additionally, "actual innocence" means factual innocence, not mere legal insufficiency. *See* Bousley v. United States, 523 U.S. 614, 623–24, 118 S. Ct. 1604, 1611–12, 140 L. Ed. 2d 828 (1998) (citing Sawyer v. Whitley, 505 U.S. 333, 339, 112 S. Ct. 2514, 2518–19, 120 L. Ed. 2d 269 (1992)); Rozzelle v. Sec'y, Fla. Dep't of Corr., 672 F.3d 1000, 1011–12 (11th Cir. 2012). Neither the Supreme Court nor the Eleventh Circuit has decided whether Schlup permits a claim of actual innocence based on new reliable evidence of a complete affirmative defense that renders the conduct of conviction wholly noncriminal and requires acquittal. *See* Rozelle, 672 F.3d at 1015.

In assessing the adequacy of the petitioner's showing of "actual innocence," the district court "is not bound by the rules of admissibility that would govern at trial." Schlup, 513 U.S. at 329.

Instead, the court is allowed also to consider "the probative force of relevant evidence . . . 'including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" *Id.*, 513 U.S. at 328 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 160 (1970)). Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing. McQuiggin, 133 S. Ct. at 1935.

Petitioner contends the affidavits of his mother and Jared Anderson, describing alleged post-trial statements of Joel Houtz, demonstrate his actual innocence. However, the reliability of Petitioner's evidence is questionable. The alleged statements of Mr. Houtz included in the affidavits are hearsay. Furthermore, the relationships of the affiants with Petitioner raise concerns regarding their reliability. Linda Robinson is Petitioner's mother, and Jared Anderson is, according to both Anderson and Petitioner, Petitioner's friend. Moreover, as discussed *supra*, Houtz's knowledge of and/or participation in the attempted robbery of Petitioner could have been discovered prior to or during trial; and the two-year unexplained delay in presenting evidence of Houtz's alleged participation in the attempted robbery weighs against the reliability of Petitioner's proof of innocence.

Additionally, Petitioner failed to show that evidence that Houtz planned, observed, or participated in the alleged attempted robbery would have had any effect on the jury's verdict. There was no dispute that Petitioner shot the victim; the issue at trial was whether Petitioner acted in self defense. At the time of Petitioner's offense conduct, Florida law provided that a defendant was justified in using deadly force against the victim only if he reasonably believed that such force was necessary to prevent imminent death or great bodily harm, and even under those circumstances, a person may not resort to deadly force without first using every reasonable means to avoid the danger, including retreat.[11] *See* Fla. Stat. § 776.012 (2004); Jenkins v. State, 942 So. 2d 910 (Fla. 2d DCA

---

[11] Effective October 1, 2005, two weeks after Petitioner shot the victim, Florida law changed to remove the duty to retreat where the defendant reasonably believes deadly force is necessary to prevent imminent death or great bodily harm, or where circumstances set forth in § 776.013 (known as the "Stand Your Ground" law) are present. *See* Fla. Stat. § 776.013 (2005); Laws of Fla. Ch. 2005–27, § 5, at 202; Williams v. State, 982 So. 2d 1190 (4th DCA 2008). The Florida Supreme Court has held that the Florida Constitution precludes retroactive application of the 2005 change in the law of self-defense. *See* Smiley v. State, 966 So. 2d 330 (Fla. 2007).

2006); State v. James, 867 So. 2d 414 (Fla. 3d DCA 2003); Hernandez v. State, 842 so. 2d 1049 (Fla. 4th DCA 2003).

In Petitioner's case, Petitioner testified he was awakened by the sound of someone opening and closing his passenger side door, and he heard a male say, "He left his door unlocked." He testified he sat up in his seat, placed his gun in his lap, and started his vehicle. He testified he placed his truck in reverse and started rolling backward a couple of feet, when the driver's side door was immediately snatched open, and a white male reached into the vehicle, grabbed Petitioner around his chest, and tried to grip him around his neck to pull him out of the vehicle. Petitioner testified he was using his left hand to push the man off at the same time the man was trying to come into the vehicle and trying to grip Petitioner's shirt to pull him out of the vehicle. He testified he was not able to completely push the man off him, but he prevented the man from leaning further into the vehicle. Petitioner testified he grabbed his gun with his right hand, put it to the man's temple, and pulled the trigger, at the same time he was using his left hand to keep the man from coming closer into the vehicle. Petitioner testified his vehicle was stopped at the time he shot the victim. He testified the man's body dropped and fell outside the vehicle, and as Petitioner caught himself to keep from falling out of the vehicle on top of the man, he looked to his left and saw another man. Petitioner testified he then got back inside his vehicle, closed the door, and drove away.

Andrea Minyard, the medical examiner, testified the bullet entered the victim's right temple area in front of and above the right ear, and it exited below his left ear (Ex. A at 159, 162). Ms. Minyard testified the direction of the bullet would be consistent with the shooter sitting in a vehicle with his arm pointing slightly downward and shooting somebody who was standing at the driver's door (id. at 163). She testified she observed a pattern on the victim's left foot which was consistent with a vehicle backing out of a parking spot and running over the foot (id. at 161).

Even if Joel Houtz had testified that he and the victim planned to rob Petitioner, and he (Houtz) was standing at Petitioner's passenger side door when the victim grabbed Petitioner around his chest and attempted to grip him around his neck to pull him out of the vehicle, these facts could not have affected the reasonableness of Petitioner's beliefs regarding whether and how to retreat before resorting to his gun, because there was no evidence Petitioner was aware of these facts (that is, that Houtz and the victim planned to rob him, and Houtz was standing at the passenger door at the time the

victim grabbed him).  If Petitioner had not known of a second assailant, the jury would have been left with the same set of facts and circumstances with which to evaluate the reasonableness of Petitioner's belief about the situation.  Further, even if the jury heard evidence that Houtz also planned to rob Petitioner and was standing at Petitioner's passenger door, there was still no evidence that Petitioner attempted to retreat.  Petitioner testified he was in his truck, which was engaged in reverse and moving at the time the victim opened the door and grabbed him, but he admitted his vehicle was stopped at the time he shot the victim, and there was no testimony he attempted to drive away or otherwise retreat before he shot the victim.  Therefore, the proffered evidence, even if "new," was hardly adequate to show that no reasonable juror would have convicted Petitioner had it been presented at trial.  Petitioner's affidavits from his mother and Jared Anderson thus fall far short of presenting a colorable claim of Petitioner's factual innocence of manslaughter with a weapon or firearm.  Therefore, Petitioner is not entitled to review of his habeas claims through the "actual innocence" exception to the federal time bar.

III.     CONCLUSION

Petitioner's federal petition was filed after the AEDPA's one-year limitations period expired. He failed to show cause for the untimely filing, or that he is entitled to review of his claims through the "actual innocence" gateway.  Therefore, Respondent's motion to dismiss should be granted, and the federal petition should be dismissed.

IV.     CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That Respondent's motion to dismiss (doc. 20) be **GRANTED**.

2.     That the petition for writ of habeas corpus (doc. 1) be **DISMISSED with prejudice** as untimely.

3.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 10ᵗʰ day of July 2013.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**